No. 28,938.

N. E. POLFER, *Appellee*, v. THE CHICAGO, GREAT WESTERN RAILROAD COMPANY, *Appellant*.

(286 Pac. 240.)

Opinion filed April 5, 1930.

*A. L. Berger*, of Kansas City, and *Walter H. Jacobs*, of Chicago, Ill., for the appellant.

*David F. Carson*, of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages to a motor truck injured in a collision with the defendant's engine at the intersection of defendant's tracks and Fifth street in Kansas City. The jury answered special questions and returned a verdict for plaintiff. Defendant has appealed.

Appellant's principal contention is that the driver of the motor truck was guilty of contributory negligence as a matter of law. This question was presented to the court below by a demurrer to the evidence, by a motion for a directed verdict, and other appropriate motions.

Fifth street in Kansas City, Kan., is a north-and-south street. It crosses the Kansas river over a bridge. A short distance north of the bridge there is a road or street leading to the west. Fifth street is intersected by seven railroad tracks numbered, for the purpose of identification in this action, from 1 to 7, inclusive, beginning at the south. Track No. 1 crosses Fifth street about 250 feet north of the bridge, and track No. 7 about 225 feet north of track No. 1. Tracks 1, 2, 3 and 4 are tracks of the Kansas City Southern railroad, and tracks 5, 6 and 7 are tracks of the Kansas City Terminal railroad. These tracks, particularly 5, 6 and 7, cross Fifth street at an angle from the northeast to the southwest. The distance between tracks 5 and 6 is 45 feet, and between tracks 6 and 7, 10 feet, if measured at right angles, but if measured along Fifth street the distances are 64 feet and 81 feet, respectively. Tracks 6 and 7 are thoroughfare tracks used for through movements, such as interchange movements, and are never used for the storage of cars. On track 7 trains travel west only, and on track 6 trains travel east only. These tracks are used for the movement of freight cars from one part of the terminal yards to another. Tracks 1 to 5, inclusive, are cross-over tracks used for switching movements, and on them, or some of them, particularly track 5, empty cars are frequently stored to the east and west of Fifth street. These are much-used railroad tracks. Just east of Fifth street and between tracks 4 and 5 is the flag shanty, and a flagman is kept on duty. On the west side of the street between tracks 4 and 5 is the ordinary railroad-crossing sign. Fifth street is paved with brick except between tracks 5 and 6, where it is surfaced with cinders, and between tracks 6 and 7, where it is surfaced with plank. It is admitted that there is a heavy

motor vehicular traffic along Fifth street across these railroad tracks, "all the way from one hundred to one hundred thousand cars a day."

Plaintiff is a farmer and feeds hogs garbage from the city. This is hauled by a truck in large cans. He had a large two-ton Peerless truck driven by his employee, Dennis Reardon, which was used for that purpose. The truck was loaded at a dock just north of the river and west of Fifth street. Reardon had been driving this truck about three years, hauling garbage from this dock to plaintiff's farm, and crossed these railroad tracks on Fifth street an average of five times a day. On the day of the collision Reardon had loaded the truck and drove on to Fifth street just north of the bridge and was driving north on Fifth street across the railroad tracks. It was about 4:45 in the afternoon on February 17. It was cloudy, raining a little, or misting rain, with some fog. The street was slippery. The street was practically level, perhaps a little uphill from the point where he entered the street to the point of collision, which was on track 7. The truck, with the load on it, weighed about 14,000 pounds. It was an open truck with a covered cab for the driver. There was a curtain on the right-hand side, but in this the isinglass had been broken out. As Reardon drove north approaching track 1, and when within about twenty-five feet of that track, he stopped and looked for trains and saw none. He started to drive north, driving in intermediate gear, at a speed eight to ten miles per hour. On track 5 a number of large refrigerator cars were standing, extending from near the street some distance to the east. As Reardon drove past the flag shanty the flagman motioned for him to go on. Reardon drove on to the north. In the condition of the street and at the speed he was going Reardon could have stopped his truck in thirty-five feet. As he approached track 7 he saw defendant's engine coming from the east, pulling six freight cars on that track. He put on his brakes and tried to stop, but it was too late. The southwest part of the engine struck the front part of the truck, smashing the engine, radiator hood and frame, and turned the truck to the west, where it stopped near the edge of the street. It was not turned over. Defendant's engine stopped at a distance of about 200 or 250 feet. It was going at a speed of about twenty to twenty-five miles per hour at the time of the collision. Had Reardon at the time he crossed track 5 looked to the right along track 7 there was nothing except the weather con-

ditions to have prevented him from seeing the oncoming train, which at that time, if the speed was estimated correctly, was about 250 feet northeast of Fifth street. But he did not look in that direction at that time, and he did not see the train until he was near track 7, and the train was almost upon him, and he was not able to bring his truck to a full stop before colliding with the train.

There was a city ordinance which (if it is valid, and its validity is not questioned here) made it a punishable offense for those in charge of an engine to permit it to cross this street at a speed greater than six miles per hour, and which also required that if the engine were backing some one should be on the rear end of it to warn persons and avoid accidents, and there is evidence on behalf of plaintiff that the engine was backing and that no one was on the rear end of it. We might say that plaintiff's evidence to the effect that the flagman did not try to stop Reardon, that the train was going at an excessive speed, that it was backing and no one on the rear end of it, and that it ran 200 feet or more before it stopped, is all sharply controverted by evidence on behalf of defendant, but it was the function of the jury and the trial court to weigh this conflicting evidence, and the verdict of the jury based on such conflicting evidence and approved by the trial court cannot be disturbed here. Hence we have stated the evidence offered on behalf of plaintiff on these conflicting points. In determining the legal question presented we must take it as true that the flagman was in his shanty, that he made no effort to stop the driver of the truck but, on the other hand, waved to him to go on, that the train was going at an unlawful and an unreasonable speed, and that it was moving backwards with no one on the rear end to avoid accidents. These things clearly establish the negligence of defendant. But the question still remains, Was the driver of the truck guilty of contributory negligence by the fact that when on track 5, at a distance of 81 feet from track 7, he could have looked to the right and seen the train approaching about 250 feet from the point of collision and did not see the train until he was so close to it that he could not stop before his truck collided with the train?

Appellant invokes the rule, frequently applied by this court (see *Butts v. Railway Co.*, 94 Kan. 328, 146 Pac. 1142; *Acker v. Railroad Co.*, 106 Kan. 401, 188 Pac. 419, and cases cited therein; also United States supreme court in *B. & O. R. R. v. Goodman*, 275 U. S. 66, and allied cases) to the effect that a railroad track is itself a sign

of danger and that a traveler who approaches the track on a highway must use due care to look, listen, or stop if necessary, before driving upon the track, and if he fails to do so and drives upon the track and is injured he is guilty of contributory negligence barring recovery. The cases referred to do not deal with the situation where there was a watchman, as in the case before us, and appellant recognizes that the force of these authorities is somewhat weakened by that fact.

In *McClain v. Railway Co.*, 89 Kan. 24, 130 Pac. 646, a traveler approached a railway crossing over a much-traveled street in a populous city where gates had been built and maintained, and finding them open, proceeded to cross the street without looking up the track. He was struck by a train and killed. In an action for his wrongful death it was contended that he was guilty of contributory negligence as a matter of law. The court held that was a proper question to be determined by the jury. In the opinion it was said:

"Ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity he does so at his peril. The application of this rule is modified to some extent by the circumstances that gates have been erected and watchmen employed at crossings. In such case a traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded. The railroad track itself is a warning of danger which a traveler cannot safely ignore, but when it is the custom of a railroad company to provide gates or flagmen and thus give other warnings of danger that a train is about to pass, the absence of such warning may lead a traveler to believe that he can safely proceed or that there will be time to cross before a train will pass. The fact that gates have been erected and are open when a traveler approaches a crossing will not justify him, of course, in closing his eyes and ears when passing over railroad tracks, but it is a circumstance to be weighed by the jury in determining whether at the time he was using the care that a reasonable and prudent man would and should exercise." (p. 30.)

And on page 34, after reciting the facts about the open gate, the absence of watchmen, and other facts, it was said:

". . . but these facts, in connection with all the other facts and circumstances of the case, were properly submitted to the jury, and it was for it to decide whether he observed the care for his own safety that a reasonably prudent man would have exercised under the same conditions."

In *Weston v. Hines*, 107 Kan. 625, 193 Pac. 340, it was held:

"Where the driver of a vehicle is about to cross a railroad track the fact that he receives a signal from a flagman to go ahead does not relieve him from the obligation to exercise due care for his own protection; but it prevents his failure to ascertain for himself whether a train is approaching (by looking

and listening, stopping for the purpose if necessary) from constituting contributory negligence as a matter of law, leaving the jury to determine whether under all the circumstances, including the giving of the signal, he acted with reasonable prudence."

On page 627, after quoting an instruction which had been complained of, it was said:

"Under this instruction the fact that the flagman signaled the plaintiff to go ahead did not relieve her wholly from the duty of looking out for herself, but did prevent her omission to take any specific precaution from constituting contributory negligence as a matter of law, the jury being left to determine whether, in view of all the circumstances, including the giving of the signal by the flagman, she exercised reasonable care. This view is in accordance with the weight of authority.

" 'It cannot be said as a matter of law that the plaintiff in such a case may rely solely upon the flagman; neither can it be said, as a question of law, that his failure to look or listen is not contributory negligence. It is a question of fact, to be determined by the jury.' (22 R. C. L. 1045.)"

In *Bollinger v. Railway Co.*, 113 Kan. 124, 213 Pac. 644, the plaintiff was driving to town over a much-traveled street intersected by a railroad track. A flagman was usually kept at this intersection when trains were near. She was familiar with the crossing, with the fact that the flagman was there when trains were near, and was not present when there were no trains. There was no flagman. At a point 28 feet from the track she could have seen the oncoming train 73 feet away. She did not see it until she was closer, then turned with the train and tried to stop, but was struck by it and injured. It was held that the question of her contributory negligence was properly submitted to the jury, citing earlier Kansas cases and cases from other states. This was followed in another case of the same title reported in 114 Kan. 669, 220 Pac. 274.

In *Peterson v. Railway Co.*, 115 Kan. 751, 225 Pac. 116, where the railroad company had erected a wigwag at a crossing, and which was out of repair at the time of the collision, the question whether the driver of the truck was guilty of contributory negligence was said to be a proper question for the jury. To the same effect is *Whatley v. Chicago, G. W. Rld. Co.*, 123 Kan. 187, 253 Pac. 1096, where one driving a horse to a wagon acted upon a signal to cross, which in fact was not intended for him. The question of his contributory negligence was held to be for the jury. A number of cases dealing with gates, gongs and safety devices are collected in the annotation of 53 A. L. R. 973 and 60 A. L. R. 1096.

In *Jacobs v. Railway Co.*, 97 Kan. 247, the driver of an automobile was held guilty of contributory negligence in attempting to cross a railroad track at a grade crossing without looking and listening for the approach of a train. Although an electric bell was maintained at the crossing, the bell was not ringing. The court distinguished that case from *McClain v. Railway Co.*, supra, by saying:

"Human intelligence guarded the crossing and operated the gate in that case. In the present case an electrical, mechanical device was intended to give warning of approaching trains." (p. 250.)

There is even more reason in this case than in the McClain case to rely on the human-intelligence element, for a flagman stationed at the crossing should be as alert to do his duty as one who is the operator of a gate. In the Decennial Digest, under the subject of "Railroads," key number 350 (28), are collected cases where flagmen were stationed at crossings and which deal with the function of the jury in passing on the question of contributory negligence. We shall not refer to these cases other than to say that the overwhelming weight of authority accords with the rules heretofore announced by this court in the McClain, Weston and Bollinger cases above cited.

At the rate the truck was being driven it would take five to six seconds to drive from track 5 to track 7 across track 6. The driver, if required to look at all, was under the natural duty to look first to the left to see if trains were coming on track 6, for that would be the first track he would reach. From the time he was on track 5 until he did look and see the train on track 7 could not have been more than three or four seconds. In view of all the facts and circumstances shown by the record, including his duty in the premises, as stated in the authorities above referred to, the question of the contributory negligence of the driver of the truck was one of fact for the jury rather than one of law for this court.

It should be noted that no complaint is made of the instructions; hence we must assume that the court properly instructed the jury on the questions argued here.

Appellant complains that the trial court overruled its motion to set aside the special findings for the reason that they were not supported by the evidence. We have examined this question and find it to be without substantial merit.

Appellant complains of the amount of damages, $1,000, and con-

tends that it was not supported by the evidence, and that the court received incompetent evidence on that question. Plaintiff testified that he had purchased the truck in 1917 for $3,500 and had used it continuously up to the time of the collision in February, 1926; that he had the truck rebuilt the spring before the collision at a cost of $400 for parts, exclusive of a body and of the labor of installing the parts, and that it was in good running condition at the time of the casualty. We think there was no serious error committed in permitting the witness to testify as to the kind of car it was and the condition it was in. A garage man who had worked on and repaired trucks, and who knew this truck, who had sold quite a few cars and kept in pretty close touch with the prices of different kinds of trucks and cars, testified that he had an opinion as to the reasonable market value of the truck just before its injury and placed that value at $1,200. He further testified the reasonable market value of the truck after it was struck was $50 for junk. It is true that at one place in his testimony he said:

"I don't believe there is a man in the automobile game knows what the market value is of a truck. . . . Oftentimes people ask six or seven hundred dollars for an automobile that ain't worth a dime."

But this went to the weight to be given to his testimony rather than to its competency. Had the jury followed the testimony of this witness accurately the judgment would have been for $1,150; but no one is complaining because it did not do so, and we pass that question.

The judgment of the court below is affirmed.