**Cecil F. CARAWAY, a Minor, By His Father and Next Friend, John R. Caraway, Respondent,**

v.

**The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Corporation, Appellant.**

No. 46581.

Supreme Court of Missouri,

Division No. 1.

Nov. 10, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 8, 1958.

George L. Gordon, Sam D. Parker, Jack W. R. Headley, Kansas City, for defendant-appellant.

Lyman Field, Rogers, Field, Gentry & Jackson, Kansas City, W. C. Jones, Olathe, Kan., for respondent.

VAN OSDOL, Commissioner.

Defendant has appealed from a $60,000 judgment for personal injuries sustained by plaintiff when plaintiff's northbound 1942 Chevrolet sedan was struck by defendant's passenger train of thirteen coaches drawn by a diesel locomotive moving westwardly at the intersection of the grade crossing of Clare Road and defendant's tracks in Johnson County, Kansas.

Defendant-appellant has assigned error of the trial court in overruling defendant's motion for a directed verdict, and in overruling defendant's after-trial motion for judgment for defendant. It is not contended plaintiff failed to make out a submissible case of negligence of defendant in failing to sound a statutory warning or in failing to sound a reasonably sufficient and adequate warning of the train's approach. Rather it is contended that, under the law of Kansas, plaintiff's evidence established his contributory negligence, and his recovery should be barred as a matter of law. Defendant-appellant also complains that the trial court erred in giving plaintiff's verdict-directing Instruction No. 1; and that the jury's award was excessive.

Clare Road, a north-south county highway surfaced with loose gravel at the time

of the casualty, passes over defendant's double track line which lies in a general northeast-southwest direction; however, as a train from the east (northeast) approaches, passes over and beyond the crossing it traverses a left-hand curve. A "cross-buck" railroad crossing sign is east of the traveled portion of Clare Road at a point fourteen feet south of the south rail of the south set of tracks; and north of the tracks on the west side of the traveled portion, there is an automatic wigwag signal device approximately thirteen feet high, the device consisting of a round disc with red light and bell so devised as to automatically wag back and forth, display a red light and ring when a train approaches the crossing.

Defendant's two sets of tracks at the crossing are ten feet apart and the rails of each set are four feet eight and one-half inches apart. As stated, the tracks pass the crossing at a curve, and they are "banked" to accommodate the trains passing through the curve—the south rails of each of the two sets of tracks being approximately six inches lower than the north rails. There is also a dip in the road "right before you entered on the tracks" and a "few bumps" south of the crossing. Thick wooden planks are spiked to the ties on either side of the rails of both sets of tracks, except that between the two sets of tracks there is a space surfaced with gravel. South of the south rail for a north-south distance of four or five feet the grade of the highway is level, then the highway lies at a southerly upgrade to a point six hundred feet south of the crossing.

The northbound highway traveler, moving downgrade toward the crossing, passes a farmhouse with large trees on his right some distance south of the crossing, then a small tree at a point approximately seventy feet south of the crossing, and, looking to his right, the highway traveler sees an embankment with vegetation thereon south of and parallel with the tracks. The traveler then moves through the dip and

jogs slightly to his left in passing over the two sets of tracks at the crossing.

The testimony of witnesses as to the point from which a northbound traveler may get an unobstructed view of the tracks to the eastward did not vary greatly. A witness testified that standing between the cross-buck sign (fourteen feet south of the south tracks) and the south track one could see down the tracks "at least 200 feet." Another witness estimated that one seated in an automobile would have to be "approximately from 9 to 15 feet" south of the crossing before he could get a clear and unobstructed view to the eastward; and from a point fourteen feet south of the crossing, a person in an automobile could only see "approximately 150 feet" to the east. Other witnesses estimated an unobstructed view could not be had until one was "between twelve and not over fifteen feet" from the crossing, or "I would say ten or twelve feet" from the tracks.

As stated, defendant's train was moving westwardly. It was moving over the south set of tracks.

There was evidence that at approximately 2:30 o'clock in the "nice" morning of May 21, 1954, accompanied by his friend Jackie Ray Mills, plaintiff Caraway was driving northwardly on Clare Road. The surface of the highway was dry, and plaintiff's automobile was in good mechanical condition. The automobile was moving thirty-five miles an hour as plaintiff started downgrade six hundred feet south of the crossing, at which point he made a light application of the foot brake. He had been over the "rough" crossing before and, because of its roughness, planned to pass over it at a speed of five miles per hour. The headlights of plaintiff's vehicle, which were on "high beam," illuminated the crossing and the wigwag signal device northwest of the crossing. Plaintiff looked at the crossing and the signal device northwest thereof and saw the red light was not burning and the wigwag was not working. Continuing downgrade in nearer approach

plaintiff shifted into second gear; he kept his foot on the brake until he almost reached the crossing at which time he was moving five miles per hour, or five to ten, in "between there." He couldn't have stopped his car in less than twenty to twenty-five feet. He did not look to the east until the front of his automobile was approximately seven feet from the track. At this point, as stated, he could see about two hundred feet down the tracks to the eastward. He didn't see "anything coming." He then looked to the west and saw no eastbound train. Then he moved on down to the crossing, and when the front wheels of his vehicle were on the south set of tracks, he again glanced to the eastward, "saw a light, and that's it."

The light was fifty feet east of him. He estimated the train was moving eighty miles per hour. As stated, he had been over the crossing before and knew there was an "automatic red light wigwag signal there," and having observed when he first saw the mechanical signal device that the device was not operating, he thought it would be all right to go ahead. He had listened for the whistle of approaching trains, but did not hear any whistle. If the signal device had been working, he would have stopped.

Plaintiff's friend, Mills, testified that he knew there was an automatic signal device at the crossing. He had gone over the crossing several times and he knew the device was "supposed to have a red light to light up, and it wig-wags back and forth and a bell rings." At the time of the casualty the device was not working. He was looking and listening and saw and heard nothing to indicate the approach of a train until the front of the automobile was about fifteen feet from the railroad track; he then saw just the headlight of a train about one hundred feet east of the crossing. The automobile was moving about ten miles per hour. He opened the door and "hollered 'jump.'" He was able to jump from the car and was not injured.

He had seen plaintiff open the door on the left, and "start to jump" from the vehicle.

The train struck the right side of plaintiff's automobile between the right front wheel and the dashboard. The engine and front wheels were severed from the body of the car. The body of the car came to rest in a ditch on the west side of the highway seventeen feet south of the tracks.

Defendant-appellant, supporting the contention of error in overruling defendant's motion for a directed verdict, urges the facts that the automatic signal device was not operating and that plaintiff relied on such fact in attempting to cross did not relieve plaintiff of the duty to look, listen and stop or otherwise make certain no train was approaching before attempting to cross. It is argued that plaintiff's duty under the law of Kansas was to look for an approaching train at that point in his progress toward the crossing from which he could have seen the farthest to the eastward; and that the physical evidence and testimony of witnesses demonstrates plaintiff could have seen the train before moving onto the tracks and could have avoided the collision had he looked, and had he been prepared to stop. On the other hand, plaintiff-respondent asserts plaintiff was not contributorily negligent as a matter of law, and the trial court did not err in overruling defendant's motion for a directed verdict. He argues that under Kansas law while the highway traveler cannot entirely rely on the fact that a mechanical signal device is not in operation at a crossing where such a device is maintained, nevertheless, the presence of such a warning device makes it properly a jury question as to whether plaintiff was contributorily negligent under all of the circumstances. It is argued that plaintiff was not required, as a matter of law, to stop before passing onto the crossing because he was entitled to rely to some extent on the inactive, unlit, silent signal device and, since he did not rely thereon entirely, the question of contributory negligence in the manner in which he looked

and listened and negotiated the crossing was for the jury.

As noted, conflicting contentions of the parties are primarily addressed to the question of the effect of the fact that an automatic or mechanical signal device is maintained at a crossing but is not in operation (and a plaintiff's reliance thereon) in determining the issue of whether a plaintiff is contributorily negligent in all of the circumstances of a given case. Defendant-appellant contends an inoperative mechanical device is unlike an open gate at a crossing which is operated by the "human intelligence" of a gateman, and that the inoperative mechanical device does not affect the rule imposing the duty upon the highway traveler to not only look and listen but, if his view is obstructed and it is essential for his safety to do so, to stop and, if necessary, go forward and look for trains. Plaintiff-respondent contends the application of the rule is modified to some extent by the fact or circumstance of an open gate (or an absent flagman) *or* by a mechanical device which is not operating, such as we have in the instant case. Defendant-appellant relies principally on Jacobs v. Atchison, T. & S. F. Ry. Co., 97 Kan. 247, 154 P. 1023, L.R.A.1916D, 783, and plaintiff-respondent principally relies on McClain v. Chicago, R. I. & P. Ry. Co., 89 Kan. 24, 130 P. 646, and Peterson v. Atchison, T. & S. F. Ry. Co., 115 Kan. 751, 225 P. 116.

In Horton v. Atchison, T. & S. F. Ry. Co., 161 Kan. 403, 168 P.2d 928, cited by defendant-appellant, the Supreme Court of Kansas quoted (168 P.2d at page 933) the court's syllabi 1 and 2 of Beech v. Missouri, K. & T. Ry. Co., 85 Kan. 90, 116 P. 213, as follows,

> " 'A railroad track is itself a warning of danger to an approaching traveler, and it is the duty of one about to cross, who is competent to exercise care for his own protection, to use his faculties of sight and hearing in the manner of an ordinarily prudent per-

son, *and the omission to do so is an omission of ordinary care, which will bar a recovery for injuries resulting from a collision with a train, notwithstanding the negligence of the railroad company in failing to sound a whistle 80 rods from the crossing.*

> " 'The fact that the view of one approaching a railroad track is obstructed for a short distance requires the exercise of greater vigilance and care on his part to learn if there is a present danger in crossing, and it is incumbent on him *to look again* when he passes the obstruction and when an opportunity exists to look and listen for an approaching train.' " (Italics are those of the Supreme Court of Kansas.)

In McClain v. Chicago, R. I. & P. Ry. Co., supra, 89 Kan. 24, 130 P. 646, the defendant had erected and maintained gates with a watchman. The gates were up or open, and there was no watchman at the crossing. The Supreme Court of Kansas, in treating with the question of whether McClain was guilty of such negligence as to bar a recovery, held that the question was one for the determination of the jury in all of the circumstances of the case. The court recognized the rule that ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity, he does so at his peril; but, it was said the application of this rule is modified to some extent by the circumstance that gates had been erected and watchmen employed at crossings. In such a case a traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded. The railroad track itself is a warning of danger which a traveler may not safely ignore, but when it is the custom of a railroad company to provide gates or flagmen, and thus give other warnings of danger that a train is about to pass, the absence of such warnings may lead a traveler to believe that he can safely proceed. The fact that gates had been erected and

are open when a traveler approaches a crossing will not justify him, of course, in closing his eyes and ears when passing over railroad tracks, but it is a circumstance to be weighed by the jury in determining whether at the time he was using the care that a reasonable and prudent man would and should exercise.

The Supreme Court of Kansas in the Horton case referred to the dissenting opinion in Johnson v. Union Pac. R. Co., 157 Kan. 633, 143 P.2d 630, cited herein by defendant-appellant, and observed that the dissenting opinion pertained to the absence of a customary flagman at a city intersection—a question in nowise involved in the Horton case. In our case of Day v. Union Pac. R. Co., Mo.Sup., 276 S.W.2d 212, we said that, in our view, the Horton case recognized the fundamental principle of the McClain case. Re-examining the case of Johnson v. Union Pac. R. Co., supra, we think the differences of the majority and dissenting judges of the Supreme Court of Kansas were not particularly on the issue of whether or not the presence of an open gate (or an inoperative mechanical signal device) is a factor to be considered and may be determinative on the question of a plaintiff's contributory negligence. The judges differed on the factual question of whether or not plaintiff's decedent, Cleo Johnson, had relied *solely* on the circumstance of the absence of the flagman at the crossing. It is noted that in the majority opinion, 143 P.2d at page 635, it was said that Cleo "did nothing whatever to insure his own safety," and in the dissenting opinion, 143 P.2d at page 641, it was thought "inaccurate to say that Cleo Johnson, driving the automobile, as he approached the intersection did nothing for his own safety." In deciding our case of Day v. Union Pac. R. Co., supra, we understood the majority opinion in the Johnson case to have held that under the circumstances *of that particular case* the fact of the absence of the customary watchman was not, as a matter of law, sufficient to present a jury question on the driver's contributory negligence.

In Jacobs v. Atchison, T. & S. F. Ry. Co., supra, 97 Kan. 247, 154 P. 1023, 1024, the crossing was protected by an electric bell (we infer the electrical device did not wag and display a light) and the vital question in the case was—"Did the failure of the electric bell to ring relieve the deceased of the obligation to look and listen before attempting to cross the track?" It will be noticed that in the Jacobs case *nothing prevented plaintiff's decedent from seeing or hearing the approaching train in time to have avoided the fatal collision if he had taken the pains to look and listen for same when he was about twenty-five feet from the crossing.* Nevertheless, the court distinguished the McClain case as follows,

"Human intelligence guarded the crossing and operated the gate in that (McClain) case. In the present case an electrical, mechanical device was intended to give warning of approaching trains. Sometimes this bell would not ring when trains were passing, and at other times it rang when no train was in sight. An electric bell, which at most can be nothing but a warning of an approaching train to those who listen, cannot be classed with a gate thrown across a street to prevent passing over railroad tracks; neither can it be classed with a flagman who stands in the street and stops those who desire to cross when there is danger. It is more nearly analogous to the locomotive bell and whistle. Failure to ring the engine bell or sound the whistle does not relieve a traveler from the duty to look and listen before attempting to cross a railroad track. If the plaintiff's contention in this respect is correct, a railroad increases its responsibility and liability by putting in electric bells at highway and street crossings. The object in putting in electric bells is to promote public safety, not to increase railroad liability. Silence of such a bell is not an invitation to cross railroad tracks without taking the ordinary precautions."

In Peterson v. Atchison, T. & S. F. Ry. Co., supra, 115 Kan. 751, 225 P. 116, at the crossing where the collision occurred, there was a wigwag signal device with light and bell which had been out of repair and was not operating at the time of the casualty. Without particular comment on these facts and without reference to the McClain or the Jacobs case, it was held that, under all of the circumstances of the case, the question of plaintiff's contributory negligence was for the jury.

Notwithstanding the Jacobs decision, the fact that a mechanical device is maintained and is not in operation, as in the Peterson case and in our case, is spoken of by the Supreme Court of Kansas (although in a case where a flagman and electric bell were customarily maintained) as a potent factor to be taken into consideration by the jury in determining a plaintiff's contributory negligence, as is observed in the following excerpt from the opinion of Kindig v. Atchison, T. & S. F. Ry. Co., 133 Kan. 459, 1 P.2d 75, at page 76, wherein the Peterson case was cited with apparent approval, and the Jacobs case was cited, examined and, we think, qualified, and the former differentiation between the highway traveler's duty at a crossing guarded by "human intelligence" (McClain) and by a "mechanical device" (Jacobs) was all but obliterated, as follows,

"It is, of course, the well-settled law in this state that a railroad track is of itself a sign of danger, that one crossing it at an intersection must realize that he must stop for the train, that the train cannot stop for him, and that due care on his part requires that he look and listen for approaching trains, and, if his view is obstructed and it is essential for his safety for him to do so, that he stop and if necessary go forward and look for trains. * * * But he is not, under all circumstances, as a matter of law, required to stop before crossing a railroad track. Jacobs v. [Atchison, T. & S. F.] Railway Co., 97 Kan. 247, 154 P. 1023, L.R.A.1916D, 783, Ann. Cas.1918D, 384. At busy intersections, such as busy city streets, where a flagman is ordinarily kept when trains are crossing, the absence of the flagman at the time he attempts to cross is a matter proper to be taken into consideration by the jury in determining his contributory negligence. Where a railway maintains a mechanical device, such as an electric bell, less reliance can be placed upon it than could be placed on the flagman, for it may be out of repair. Jacobs v. [Atchison, T. & S. F.] Railway Co., supra. *Perhaps it is more accurate to say that the person approaching the intersection cannot rely entirely on the fact that the mechanical device is not in operation where one is maintained, or that the flagman is not present where one is usually maintained. He still is under the duty to use due care for his own safety, but these are potent factors to be taken into consideration by the jury in determining his contributory negligence.* Bollinger v. (Schaff) Railway Co., 113 Kan. 124, 213 P. 644, and cases there cited; also Peterson v. [Atchison, T. & S. F.] Railway Co., 115 Kan. 751, 225 P. 116; Polfer v. Chicago, G. W. R. Co., 130 Kan. 314, 286 P. 240." (Our italics.)

(Some of our Missouri cases are noted —Davis v. Illinois Terminal R. Co., Mo. Sup., 291 S.W.2d 891, treating with Illinois law, and examining Graham v. Illinois Terminal R. Co., Mo.App., 260 S.W. 2d 846; Grace v. Smith, 365 Mo. 147, 277 S.W.2d 503; Day v. Union Pac. R. Co., supra; Rinderknecht v. Thompson, 359 Mo. 21, 220 S.W.2d 69; Mullis v. Thompson, 358 Mo. 230, 213 S.W.2d 941; Rhineberger v. Thompson, 356 Mo. 520, 202 S. W.2d 64, and cases therein cited; and see Scott v. Missouri Pac. R. Co., 333 Mo. 374, 62 S.W.2d 834, and Blackwell v. Union Pac. R. Co., 331 Mo. 34, 52 S.W.2d 814, treating with Kansas law. And particularly are noted Montgomery v. Missouri Pac. R. Co., 181 Mo. 477, 79 S.W. 930, and Edwards v. Chicago & A. R. Co., 94 Mo. App. 36, 67 S.W. 950, cited in Bollinger v. (Schaff) Railway Co., supra, 213 P. at page 646.)

In the instant case, it is· true that when plaintiff had come to the point from which he said he first looked to the eastward, that is, when he, seated in the vehicle was fourteen feet from the south rail of the south tracks, he, according to his testimony, could not have stopped his vehicle at the rate of speed he was moving in less than twenty to twenty-five feet. This fact shown by plaintiff's own testimony makes it unnecessary to consider defendant's contention that the physical evidence and testimony of other witnesses demonstrated that plaintiff did not look, as he said he did, when he was fourteen feet south of the south rail. Plaintiff surely should concede that his automobile was not under such control, when he was fourteen feet from the crossing, that he could have stopped the vehicle short of the pathway of the approaching train. Realistically, it was quite as if he had not looked at the point fourteen feet south of the track where he said he did. We now say that if it were not for the circumstance of the silent, unlit, inactive signal device, we would readily hold in all of the other shown circumstances of this case that plaintiff was guilty of contributory negligence as a matter of law in failing to look when he had come to a place where he could see, or in failing to stop and look, if necessary, or have his vehicle under such control as to enable him to stop safely south of the tracks upon seeing the approaching train. Rule v. Atchison, T. & S. F. Ry. Co., 107 Kan. 479, 192 P. 729; Horton v. Atchison, T. & S. F. Ry. Co., supra, 161 Kan. 403, 168 P.2d 928. Surely, if plaintiff had relied solely on the fact that his view to the eastward down the tracks was obstructed, we could not but hold that he was guilty of contributory negligence as a matter of law. Scott v. Missouri Pac. R. Co., supra, 62 S.W.2d at page 837. But where there are other facts and circumstances· from which an ordinarily prudent person could reasonably believe he could cross the tracks in safety, · the question of contributory negligence should ·be held as one of fact to be determined by the jury. Scott v. Missouri Pac. R. Co., supra; and see also Blackwell v. Union Pac. R. Co., supra. In the instant case we again point to the substantial evidence tending to show that when plaintiff and his friend Mills had come to the point on Clare Road where the headlights of plaintiff's vehicle shone upon the mechanical signal device northwest of the crossing they saw the device was not working. They were familiar with the fact that the crossing was guarded by the device and with the manner in which it indicated the approach of a train to the crossing and relied to some extent on the fact that it was not operating. Moreover, there was evidence from which it reasonably could be inferred that plaintiff (and Mills) did not entirely rely on the inoperative signal device; and the physical aspect and condition of the roadway and crossing are also to be taken into account, we think. Plaintiff listened for the whistle of a train and heard no whistle indicating a train's approach. We have also noted the circumstances of the banked, uneven elevation of rails of both sets of tracks; the loosely graveled surface of the roadway; and the "bumpy" condition of the roadway near to and south of the crossing, to some extent engaging plaintiff's attention in managing his vehicle's traction in such manner as to approach the crossing, which the signal device had indicated was free of the danger of an approaching train, and to pass over it in safety to himself and the passenger Mills. In all of these circumstances, especially including the "potent" circumstance of the inoperative warning device, we do not·wish to say that, as a matter of law, plaintiff was guilty of contributory negligence which should bar his recovery. We think the issue was one of fact for the jury. McClain v. Chicago, R. I. & P. Ry. Co., supra; Peterson v. Atchison, T. & S. F. Ry. Co., supra; Kindig v. Atchison, T.· & S. F. Ry. Co., supra; Bollinger v. (Schaff) Railway Co.,·supra, 113 Kan. ·124, 213 P. 644, Id., 114 Kan. 669, 220

P. 274; Polfer v. Chicago, G. W. R. Co., supra, 130 Kan. 314, 286 P. 240; Scott v. Missouri Pac. R. Co., supra; Blackwell v. Union Pac. R. Co., supra; Montgomery v. Missouri Pac. R. Co., supra.

We hold that the trial court did not err in overruling defendant's motions for a directed verdict and for judgment.

Plaintiff's verdict-directing Instruction No. 1, of which defendant complains, required the finding of the facts of the approach of defendant's train and of plaintiff's automobile and the collision of the train with plaintiff's car at the crossing, and continues in initially submitting and requiring the finding that "defendant Railway Company, through its agents, servants and employees" operating the train "negligently and carelessly" failed to sound the statutory warning and "negligently and carelessly" failed and neglected to sound a reasonable and sufficient and adequate signal of warning. The instruction continues in conjunctively hypothesizing and requiring the findings of the facts of defendant's maintenance of the wigwag signal device, of its inoperative condition, of plaintiff's knowledge of the device and his reliance on it, in the exercise of ordinary care for his own safety, to indicate the approach of trains, and of the circumstances of the obstructed view of plaintiff in his approach. The further findings are required that plaintiff in the exercise of reasonable and ordinary care for his own safety and in reliance of the failure of the wigwag signal to work, failed to observe the train's approach until too late in the exercise of reasonable and ordinary care for his own safety to avoid being struck, and that plaintiff was otherwise in the exercise of due care for his own safety at all times as he approached and drove onto the tracks—"and if you further find that the foregoing negligence and carelessness, if any, as outlined above, of defendant Railway Company * * * directly and proximately caused the violent collision * * *."

Defendant argues that the hypotheses of the facts pertaining to the maintenance of the mechanical device and its inoperative condition, which facts we have paraphrased, together with the language of the last clause we have quoted, "clearly lets the jury find" that the failure of the wigwag to work is negligence of defendant, particularly so, says defendant, inasmuch as the clause refers to and requires that the "foregoing negligence and carelessness, if any, as outlined above" of the *defendant Railway Company,* as distinguished from the required finding of the negligence and carelessness of defendant Railway Company, *"through its agents, servants and employees"* as expressed initially in the instruction.

If it were assumed the instruction submitted specific negligence of defendant in failing to maintain its mechanical warning device in working order, we should agree with defendant that the instruction was prejudicially erroneous in failing to require the further finding of defendant's knowledge, actual or constructive, of the inoperative condition of the device for such a period of time, prior to the occurrence of the collision and injury, that the condition could have been remedied, or other precautions taken. Willsie v. Thompson, 359 Mo. 775, 223 S.W.2d 458; Rinderknecht v. Thompson, supra, 220 S.W.2d 69. And, again assuming the instruction submitted specific negligence of defendant in failing to maintain its mechanical warning device in working order, the error in failing to require the finding of defendant's knowledge, actual or constructive, of its inoperative condition, may well have been none the less prejudicial although such negligence was submitted conjunctively with the submissions of negligence of defendant in failing to sound warnings. Glowacki v. Holste, Mo.Sup., 295 S.W.2d 135; Beahan v. St. Louis Public Service Co., 361 Mo. 807, 237 S.W.2d 105. However, having critically studied the instruction, we have concluded that the hypothe-

ses and requirement of the facts of maintenance of the wigwag device and of its inoperative condition were of circumstances in connection with the submission of the negative of plaintiff's negligence. Nowhere in the instruction was the "negligence and carelessness" of "the Railway Company" or of "the Railway Company, through its agents, servants and employees" in failing to maintain the device in working order expressly hypothesized or submitted; and the negligence and carelessness of the Railway Company in failing to sound warnings was expressly hypothesized as through the Railway's "agents, servants and employees." Although we have the opinion the instruction was not erroneous in the respect complained of, we do think the submission of causal connection should have been more clearly set out in apposition or with reference to the negligence and carelessness of the Railway Company as submitted earlier in the instruction; and if the trial judge had been of the opinion that, under the facts as shown in evidence, the instruction was misleading and had specified that ground in directing the award of a new trial, we do not say we should not sustain such a new-trial order. Defendant further contends the hypothesis of the fact that the signal was not working and plaintiff's reliance thereon renders the instruction erroneous in permitting a finding that plaintiff in the exercise of ordinary or reasonable care, could rely on the failure of the device to operate. This, says defendant, is contrary to Kansas law. The Jacobs case is again cited. We have already examined the essentially like question in ruling that plaintiff was not contributorily negligent as a matter of law.

Plaintiff, nineteen years old at the time of trial, had attended grade school, and had become an apprentice carpenter at the age of sixteen, not long before he was injured. When the train forcibly collided with plaintiff's car, apparently plaintiff was thrown to a point south of the tracks twenty-four feet west of the highway.

He was in a semi-conscious or unconscious condition; was hospitalized; and was found to have sustained serious and multiple injuries. According to the summary of diagnoses, plaintiff had sustained (1) cerebral contusion and laceration with subarachnoid bleeding; (2) multiple facial lacerations; (3) traumatic shock; (4) pulmonary contusion and atelectasis; (5) traumatic pneumothorax; (6) fracture left 9th rib (inferred by physicians from the fact that the lung was punctured); (7) traumatic laceration of spleen; (8) fracture left ulna; (9) fracture left tibia. A physician also testified of fractures of the rami of the pubic bone, posterior to the bladder; and an X ray revealed some separation on the left side in the sacroiliac joint.

The contusion of the brain with bleeding necessitated a spinal puncture to relieve the pressure of the drainage of blood from the brain into the spine. The collapsed left lung and the injury to the throat required incisions for drainage to facilitate breathing and eliminate mucous pending treating and healing. It was necessary to entirely remove the ruptured spleen. During this latter operation it was seen there was some involvment of the pancreas. The fractures, of course, were reduced. Plaintiff was discharged from the hospital in twenty-six days. In the earlier days of his confinement he was intermittently irrational. The total medical expense was $2,172.62.

Plaintiff returned to work in September, 1954, and since has been employed at various jobs with wages ranging from $22 to $76 per week. It is inferred he has not required further medical treatment.

Plaintiff made a good recovery considering his numerous injuries and their nature. However, a physician, who had examined plaintiff a few days before the trial, estimated plaintiff has permanent partial disability to his body "as a whole," with respect to manual labor, of about 50 per cent. There was substantial evidence of some

atrophy of the left leg with partial loss of strength and ten to fifteen degrees impairment of motion of the left knee. There was also some atrophy of the left arm with partial loss of grip of the left hand. Plaintiff has suffered some loss of memory and is forgetful; has lost his former energy; no longer enjoys sports as he did before; is afflicted with acute pains in the stomach with nausea; eats only soup and "stuff like that"; sustained a five per cent loss of hearing in both ears; weighs 118 pounds as contrasted with 158 pounds before his injury; and does not rest well at night, has nightmares; wets the bed occasionally, and gets up twice a night to urinate. He complains of pain at the sites of the several injuries and the surgery.

We have been cited no case and have found none wherein is detailed injuries altogether of nature and extent as here. We have stated plaintiff's various complaints which witnesses, physicians, attribute to one or another or a combination of the several injuries sustained in the collision, and we do not doubt the effect of the evidence in showing plaintiff sustained painful, severe and permanent injuries with quite substantially far-reaching effect as a whole on the ability of the comparatively uneducated plaintiff with a life expectancy of 51.12 years to earn a livelihood, and we do not leave out entirely the residual effect of his brain injury and the involvment of his digestive and urinal tracts as having the consequences of causing discomfort and inconvenience, and in circumscribing a full, active enjoyment of life.

■ Defendant has cited the case of Votrain v. Illinois Terminal R. Co., Mo. Sup.1954, 268 S.W.2d 838, in which the $75,000 award was reduced in the trial court to $45,000 and upon appeal to $35,000. The Votrain case is persuasive authority for our view that the award of $60,000 in this case is excessive in substantial amount. It was established that plaintiff Votrain had a back condition which might be corrected by a spinal fusion, "fifty-fifty chance" operation; permanency of headaches and pains in the shoulders, back and legs; certain increase in the intensity of back pains in lifting objects; permanent weakness in the left arm and hand; permanency of pain in the left elbow, especially in lifting objects, the degrees of which will increase; inability to sleep; inability to perform manual labor involving lifting objects and difficulty in doing work while sitting down. Plaintiff Votrain was seven years older than plaintiff Caraway at the time of the respective trials, and it seems plaintiff Votrain sustained no brain injury. Moreover, in admeasuring a remittitur to be conditionally required, we here say we know of the almost constant depreciation of the purchasing power of money during the last few years and, considering this together with other relevant factors to be taken into account, we have the opinion the award is excessive in the amount of $15,000.

Therefore, if plaintiff, within fifteen days, enters a remittitur of $15,000, the verdict and judgment should stand in the amount of $45,000 as of the date of original rendition; otherwise, the judgment should be reversed and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.