Henry HAMILTON, Respondent,

v.

Neal J. ROSS and Carl B. Rechner, Appellants.

No. 45773.

Supreme Court of Missouri, Division No. 1.

July 8, 1957.

Rehearing Denied Sept. 9, 1957.

**813**

Clyde J. Linde, Robert B. Langworthy, Billy S. Sparks, Kansas City, for appellants. Langworthy, Matz & Linde, Kansas City, of counsel.

Arthur C. Popham, Sam Mandell, Kansas City, for respondent. Popham, Thompson, Popham, Mandell & Trusty, Kansas City, of counsel.

COIL, Commissioner.

A jury awarded Henry Hamilton $20,000 as damages for personal injuries sustained when he fell down stairsteps in a Kansas City apartment building owned and managed by appellants Ross and Rechner, respectively. Appellants, herein called defendants, have appealed from the ensuing judgment and contend that the trial court erred in ruling that respondent, herein called plaintiff, made a submissible case, in instructing the jury, and in permitting prejudicial jury argument. Defendants also contend that the verdict is grossly excessive. Plaintiff's motion to dismiss the appeal is overruled. For the reasons which will appear, we hold that the judgment of the trial court should be affirmed.

Plaintiff, 70 when injured, lived with his wife at the Pickwick Apartments, and they wanted a different mattress. On April 30, 1953, Mrs. Joseph Spragg, then the apartments' resident manager, since deceased, informed plaintiff and his wife that they might have a different mattress if plaintiff would assist the apartment janitor, Harry Jackson, in transporting it from a third-floor room to plaintiff's second-floor apartment. Plaintiff agreed to so assist, and Jackson directed that plaintiff carry the front end while he handled the rear of the 60-pound, double-bed mattress.

Viewing the evidence from a standpoint favorable to plaintiff, a jury reasonably could have found the facts of the occurrence to have been as they appear in this statement. Plaintiff started backing down the steps with both hands under the mattress and with its upper part against his head when Jackson (in the rear), who had one hand under the mattress and one up over the back of it, and while Jackson was still on the third floor and before he had begun to step downward, told plaintiff to "Stop, I am going to lose my hold." Plaintiff stopped, turned his head, and saw that Jackson had lost his hold on the mattress and had fallen onto one knee. Jackson then

rose from his position on one knee and suddenly pushed his shoulder against and put his weight against the mattress with sufficient force to knock plaintiff backward down about ten steps. Plaintiff did not know what caused Jackson to go to one knee but was watching him as he did. Plaintiff testified, on cross-examination, that Jackson's going to one knee "and getting up was all in one motion," but, in our view, his testimony as a whole did not compel the jury's conclusion that there was any reason for Jackson to have risen from his position on one knee immediately or in any particular manner or in such manner that he would strike the mattress and cause plaintiff to be knocked down the stairs.

A jury, viewing the evidence favorably from plaintiff's standpoint, reasonably could have found that the immediate cause of plaintiff's fall was not the fact that Jackson lost his hold on the mattress and fell to one knee, but was the manner in which Jackson rose or attempted to rise from one knee.

Jackson's own testimony as to the occurrence which resulted in plaintiff's fall was contrary to plaintiff's version and may be ignored except in so far as Jackson testified that his hand did slip from the mattress and that he told plaintiff to put the mattress down and that plaintiff did so, and except Jackson's further statement to the effect that he knew that he was supposed to handle his end of the mattress so as not to knock plaintiff down the steps which he knew was likely if the mattress got away from him.

Defendants say the trial court should have directed verdicts for them because there was no evidence of the reason that Jackson lost his hold on the mattress and fell to one knee; that, in the absence of any such evidence, and in the absence of evidence that Jackson intentionally dropped the mattress, there was no evidence of any negligence on Jackson's part. To illustrate their point, defendants say that Jackson may have been caused to fall to one knee by a "heart attack * * * a dizzy spell * * * or for any accidental [and non-negligent] reason whatsoever." Defendants' position is perhaps best summarized by this sentence from their brief, "There could only be actionable negligence if Jackson did some negligent act which caused his. end of the mattress to get loose."

Defendants rely on cases which in the main deal with fact situations in which fellow employees were carrying or handling objects and wherein one employee suddenly let go of or lost his hold, thereby causing injury to plaintiff. For example: Neth v. Delano, 184 Mo.App. 652, 171 S.W. 1; Hawley v. Lusk, Mo.App., 184 S.W. 1173; Book v. Missouri Pac. R. Co., Mo.App., 257 S.W. 498. See and compare: Karagas. v. Union Pac. R. Co., Mo.App., 232 S.W. 1100; Bequette v. National Lead Co., Mo. App., 31 S.W.2d 575; Martin v. Union Pac. R. Co., 214 Mo.App. 307, 316, 317, 253 S.W.. 513, 516 [8].

In our view, the instant case is not controlled by such cases wherein the immediate· and proximate cause of injury was the sudden releasing of one's hold upon an object being carried. That is because, as we have noted heretofore, the jury reasonably could have found in the instant case that Jackson's losing his hold on the mattress and falling to one knee was not the immediate and proximate cause of plaintiff's injury. Plaintiff saw Jackson lose his hold and fall to one knee at a time when plaintiff had' stopped and was stationary and at a time when plaintiff had put down the mattress in accord with Jackson's direction. The jury reasonably could have found that, had Jackson remained on one knee until plaintiff had removed himself from a position of danger, or had Jackson exercised ordinary care in rising from his position on one knee· so as not to strike the mattress with force,. no injury would have occurred to plaintiff..

■ Every person has the duty to exercise ordinary care to so conduct himself as not to injure others, and is liable to one· who is harmed by a breach of that duty. 65 C.J.S. Negligence § 4b(2) (a), p. 340; May v. Chicago, B. & Q. R. Co., 284 Mo..

508, 526, 225 S.W. 660, 665 [11–13]. "Negligence * * * depends upon surrounding circumstances, as well as upon the particular conduct involved, because an act or omission which would clearly be negligence under some circumstances might not be negligence under other circumstances and surroundings. Negligence is always a question for the jury ' * * * where * * * different minds may reasonably draw different conclusions from' " the facts. Rouchene v. Gamble Construction Co., 338 Mo. 123, 131 [2], 89 S.W.2d 58, 61 [3–6]. Significant circumstances to consider in the instant case in determining whether the jury reasonably could have found Jackson's conduct negligent are the facts that Jackson knew that his assistant was a 70-year-old man, knew that the 70-year-old man was carrying the *front* end of a heavy, bulky mattress, and knew that the 70-year-old plaintiff was descending steps and thereafter standing with his back to the lower floor in a position fraught with danger upon force being exerted against the mattress.

■ We are of the view that a reasonable man might conclude that under those circumstances, Jackson, who had the duty to exercise ordinary care not to injure plaintiff in the process of transporting the mattress, should, in the exercise of ordinary care, have so conducted himself after he lost his hold and went to one knee as not to have thrown his weight suddenly against the mattress. If so, the jury properly could have found that Jackson's negligence proximately caused plaintiff's injury and thus the trial court did not err in submitting the case to the jury.

■ Plaintiff's verdict-directing instruction was: "The Court instructs the jury if you believe from the evidence that in order for plaintiff to obtain the mattress in question for his bed there was mutual understanding between him and the resident manager Mrs. Spragg that he was to assist said janitor Jackson in taking said mattress down said steps, and if you find that pursuant thereto he was carrying and holding the lower end and Jackson the top end, *and if you find Jackson permitted his hold on the upper end to get loose and it to be shoved downward and so manipulated it that sudden extra weight came onto plaintiff*, and if you find that in the above-submitted respects Jackson failed to use ordinary care toward plaintiff, and if you find that as a direct result thereof plaintiff was caused to fall down said steps and was thereby injured, if you so find, and if you find plaintiff at all times used ordinary care and that defendant Rechner was then operating and managing said property and renting it out and collecting the rents and selecting and employing and paying and directing and controlling all the help and managing same on behalf of and as agent of the owning defendant Ross and was in exclusive charge thereof and acting in the above-submitted respects, if you so find, then your verdict should be for plaintiff Mr. Hamilton and against both defendants." (Our italics.)

Defendants contend that the instruction was erroneous for the stated reasons that it "failed to hypothesize any facts as to what constituted the negligence of Jackson. It assumes that allowing the mattress to become loose and to place additional weight upon plaintiff amounted to negligence, no matter what the cause of Jackson's actions. It does not channelize negligence." Defendants say that the only language purporting to hypothesize negligence were these words (italicized in the instruction quoted above): "Jackson permitted his hold on the upper end to get loose and it to be shoved downward and so manipulated it that sudden extra weight came onto plaintiff," and that, therefore, the jury was authorized to find that Jackson was negligent solely because he lost his hold on the mattress, irrespective of the reason for his so doing.

The instruction, however, did not, as defendants contend, submit Jackson's permitting his hold on the mattress to be loosened as his sole and only negligence. The instruction submitted conjunctively these additional hypotheses of negligence, viz., that Jackson permitted the mattress to be shoved

downward *and* that Jackson so manipulated the mattress that sudden extra weight came onto plaintiff. We think the instruction hypothesized sufficient facts, under the circumstances, to authorize a recovery on the theory under which we have held plaintiff made a submissible case, viz., that Jackson's negligence after he had lost his hold and had gone to one knee caused plaintiff's injury. It is true that the instruction does not specifically hypothesize that Jackson arose from one knee in such a manner as to cause a sudden extra weight against the mattress and against plaintiff, etc. But the instruction does require the finding that Jackson negligently permitted the mattress "to be shoved downward and so manipulated it [the mattress] that sudden weight came onto plaintiff." Under plaintiff's testimony, the jury would have understood that the basis on which they would have found that Jackson so negligently permitted the mattress to be shoved downward and so negligently manipulated the mattress as to cause sudden extra weight to go onto plaintiff, was to find that Jackson's weight went against the mattress as he rose from one knee. We think, therefore, that the instruction sufficiently submitted the essential fact issue.

■ On direct examination plaintiff was asked and answered: "Q. So, altogether you have seen Dr. Mucie, Dr. Fitzgerald, and Dr. McGrath, is that right? A. Yes. "Q. A doctor was also employed by them and he has examined you?' A. Yes, sir."

The defendants adduced no medical testimony and of course the doctor referred to in the foregoing question, whoever he was, did not testify. During plaintiff's attorney's jury argument the following was said and occurred:

"Mr. Popham: They are willing to go out and hire Dr. Elliott, and employ him—

"Mr. Linde (interrupting): Your Honor, that is outside of the scope of the evidence.

"Mr. Popham: The evidence is that they had the plaintiff examined by Dr. Elliott.

"The Court: Overruled.

"Mr. Popham: They employed Dr. Elliott to examine this man and the whole theory was you were going to hear from him. I didn't believe they would ever put on a man of the type of Jim Elliott, a man of his great ability. You know why they didn't bring Dr. Elliott; you know why they left him off the stand. If he had helped them a bit in the world they would have had him here. Why would they go out and employ him to make an examination and not use him? You know, you weren't born yesterday. They let the injuries go by default, that is what happened; let's be frank about it."

Defendants contend that the trial court erred in failing to sustain their single objection that plaintiff's counsel's statement as to defendants' employment of Dr. Elliott was outside the scope of the evidence and in permitting plaintiff's counsel to build an argument on the fallacious premise that the evidence showed Dr. Elliott on defendants' behalf had examined plaintiff.

It seems clear to us that plaintiff's counsel's question, whether another doctor "employed by them" had examined plaintiff, meant whether a doctor employed by defendants had examined plaintiff, and we have no doubt that the jury so understood. It was, therefore, permissible for plaintiff's counsel to refer in argument to the fact that a doctor employed by defendants, who had examined plaintiff, had not testified and to argue that the jury should draw therefrom an unfavorable inference. Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 666, 253 S.W.2d 122, 131 [13].

The only meritorious question then is whether plaintiff's counsel's statement that the evidence showed defendants had hired Dr. Elliott and the argument referring to Dr. Elliott constituted reversible error. While the evidence did not show the doc-

tor's name, the evidence did show that a doctor, presumably a doctor of great ability, had been hired by defendants and had examined plaintiff. We see no possible prejudice accruing to defendants on account of ascribing a name to the doctor. The effectiveness of the argument, and its prejudicial effect, if any, on defendants, was by reason of its legitimate theme that a doctor, paid by defendants, had examined plaintiff, had not testified, and, therefore, defendants were letting "the injuries go by default." The fact, standing alone, that the doctor was called Dr. Elliott added nothing to the effectiveness of the otherwise proper argument and thus we hold that the trial court's failure to have sustained defendants' objection was not error affecting the merits of the action and, therefore, not reversible error. Section 512.160, subd. 2 RSMo 1949, V.A.M.S.

■ Defendants contend that the verdict and judgment for $20,000 are grossly excessive. As noted, plaintiff was 70 when injured and 73 at trial time. For six years prior to the accident he had owned and operated a restaurant in Kansas City. He had performed physical work in connection with every phase of the restaurant's operation. He was in good health, had no limitations of motion or weakness in his arms or hands. He had habitually gone to work at 5 a. m., seven days a week.

In April, 1953, he fell down six or seven steps, and, according to plaintiff, had a "hole in his head" and both arms were broken. His regular doctor came on call and transported plaintiff to the Osteopathic Hospital where he was given morphine for pain and was X rayed. He thought he had broken his right hand through the knuckles and just above the right wrist, and that he had broken his left arm at the elbow. (Plaintiff was mistaken about having broken his right hand through the knuckles. There was no such break.) He remained in the hospital for six or seven days on the first trip and then returned to the hospital for another six days for an operation on his left elbow. He suffered pain. His hospital bill was $500. When he returned to his home permanently, he could not do anything for himself for a period of three months, and for another six months he could not use his arms and hands effectively. He stated that the "hole in the head" and a back injury had healed and did not bother him much at trial time. His main disability is in both hands and in his left elbow. He said that motion in the left elbow was greatly limited and that the elbow bowed out on the side and had not over 50 per cent of its former strength. He said his left hand, particularly the fingers, and his left wrist were swollen and stiff and that he could not make a tight fist with either hand, and that he could not pick up small objects.

Plaintiff operated the Kansas City restaurant for three months following the fall but had to hire a part-time cook at $60 a week and a part-time waitress for $30 a week. He found he could not successfully continue to operate that restaurant and consequently sold it and moved to Waverly, Missouri, where he purchased another restaurant which he attempted to operate. He operated that restaurant for a year, but found that he could not successfully continue because his hands would swell more and get stiffer. He had to hire a full-time cook for $120 a month in Waverly. Furthermore, Waverly's climate was damp and plaintiff decided to move to a warmer climate. He and his wife moved to California where they were at trial time managing a small hotel at a combined income of $300 a month.

Plaintiff said that at trial time he had very little strength in his fingers; he could button his shirt only up to the third button from the top; he could not handle a knife and fork normally; and his hands were generally weak.

Dr. Mucie, plaintiff's regular osteopathic physician, attended plaintiff immediately following the accident. X rays disclosed a Colles fracture of the right wrist and comminuted fractures of the left elbow. Dr. McGrath, who was called in for surgery,

removed bone fragments from the left elbow and set the right wrist to which a plaster-of-Paris cast was applied and remained for two months. Upon leaving the hospital, plaintiff went to Dr. Mucie's office biweekly for at least three months for physiotherapy treatments. Dr. Mucie said that plaintiff's left elbow is permanently deformed and plaintiff's inability to make a fist with either hand is a permanent condition. Dr. Mucie's bill was $200.

Dr. McGrath, an osteopathic physician and surgeon, examined plaintiff on the date of the accident at Dr. Mucie's request, and found him to be in a severe state of shock and suffering from multiple fractures. He had a fracture of the head of the left radius near the elbow, a dislocation of the left elbow joint, and a Colles fracture of the right radius near the wrist joint. Dr. Mc-Grath said that the head of the radius was comminuted in such manner that it was not indicated to try to repair it other than to remove the bone fragments, which was done by open reduction. The wrist fracture was set by closed reduction. As a result of the fractures, plaintiff's left arm is restricted to 60 per cent of the normal range of movement which is a permanent restriction. Plaintiff has a limitation of flexion of his left elbow and of the fingers of the right hand. Plaintiff's inability to make tight fists with either hand is permanent, as is his inability to button his clothes and perform other normal functions with his hands. The instant accident had exaggerated arthritic changes in plaintiff's left elbow. Dr. McGrath's bill was $605.

Dr. Fitzgerald, an orthopedic surgeon, examined plaintiff in 1953 and again in 1956 just prior to the trial. In 1953, plaintiff's complaints were referable to his right arm, left elbow, and left shoulder. An examination of the right forearm, wrist, and hand showed a prominence of the radial styloid, an ulnar deviation of the hand, that both ends of the radius were considerably enlarged, and a noted prominence on the dorsal surface indicating present dorsal tipping of that bone. There was atrophy of the muscles of the hand. Motion of the right wrist on supination was limited to 60 degrees of normal, extension was limited to 15 per cent of normal range, and flexion was limited to 30 per cent of normal range. The left elbow showed a well-healed scar three inches in length. Plaintiff could raise his left arm to 130 degrees and flex it to 105 degrees. He had no other motion in straightening and bending his elbow. There was definite atrophy of the muscles of the arm. He could bend his left wrist forward about one third of normal. When plaintiff attempted to make a fist with his left hand, the fingers lacked approximately one-fourth inch of touching the palm and the fingers were stiff and tight. There was marked atrophy of the muscles of the palm of his hand. There was pain on movement of the left elbow. The muscles of the left shoulder were smaller than those of the right. Extension of the left arm was limited to 10 per cent of normal, its internal rotation was limited 75 per cent, while external rotation was normal. There was a tenderness in the area of the left arm between the elbow and the shoulder.

Dr. Fitzgerald's examination on June 15, 1956, just prior to trial, showed a radial deviation of plaintiff's right hand toward the thumb side, which was secondary to and caused by a marked shortening of the bone which had taken place in the healing of the fracture. The prominence of the styloid process of the right ulna remained and there was a lack of union of that process at the fracture site. There was evidence of the onset of traumatic arthritis in the left elbow joint and a disruption and deformity of that joint because the head of the radius had been removed. There was some arthritis in the left wrist. The arthritic conditions in the left elbow and left wrist were progressive and permanent. Plaintiff had 50 per cent of normal motion of forward bending of his right hand. He could carry his left elbow upward from his side at 130 degrees and could bring his left elbow up to 10 degrees above a middle line or to a place 35 degrees less than normal.

He could turn his left hand both ways although both wrists were limited in motion. There was mild atrophy of the muscles of the left forearm.

Plaintiff's hospital and medical expenses were $1,300. Plaintiff paid out about $2,500 for cooks and a waitress due to the accident. He proved no specific loss of earnings or impairment of earning capacity and any inference thereupon would have been conjectural. In summary, plaintiff suffered a fracture of his right wrist with deformity in healing, and lack of union and prominence of the styloid process of the right ulna at the fracture site. He suffered a fracture of his left elbow with resulting permanent traumatic arthritis therein and deformity of the elbow joint. He had some arthritis in the left wrist. The deformities of his right arm and of his left elbow are permanent. He was hospitalized for 13 days. He has suffered general weakness in both hands, being permanently unable to make tight fists. He has an over-all limitation of motion of his left arm of 60 per cent of normal and he has limitation of motion in his right arm and in both hands. He received physiotherapy treatments for three months following the accident. He, with the help of his wife, was at trial time earning $300 per month, but no showing as to his preaccident earnings was made. His proved special damages were in the sum of $3,800.

Defendants and plaintiff both cite Lonnecker v. Borris, Mo., 245 S.W.2d 53, to support their respective contentions that the verdict is and is not excessive. There, plaintiff, a 69-year-old woman, sustained a Colles fracture of the right wrist with permanent limitation of wrist motion of 35–40 per cent and limited activity of that hand. Her right wrist was one-half inch longer than her left and her left forearm was slightly larger in circumference than her right. She could no longer work at selling coats and dresses. Her claim as to loss of wages was not credible because she had not worked for so long prior to her injury. A verdict for $12,500 was there reduced to

$10,000. Defendants say no more than $10,000 should stand in the instant case because of Lonnecker. Plaintiff points out that the injury in Lonnecker was to one arm only and that it occurred in 1951, while the injuries to plaintiff in the instant case were to both hands and arms, and that the purchasing value of the dollar has greatly decreased since 1951, and uses Lonnecker as a criterion that the $20,000 jury verdict should stand. We think, however, that our case of Hanson v. Tucker, 303 S.W.2d 126, more nearly furnishes a proper guide for determining excessiveness in the instant case. In Hanson, a verdict for $15,000 was affirmed in favor of a 62-year-old woman who suffered fractures of the left clavicle and two ribs. She was hospitalized for 20 days and wore a plaster cast for six weeks from her neck to her waist; her left arm was in a sling for four weeks thereafter; her right ankle was swollen for three months and would give way under her. She had an unsatisfactory union of the collar bone after six weeks, but satisfactory union was thereafter obtained. There was atrophy in her shoulder and arm and she received X-ray therapy for bursitis of the shoulder and arm. The doctor had seen her 28 times. She had a permanent limitation of motion in her arm and shoulder so that she could not perform functions normally performed with the hands. She had been in prior good health and she no longer could work at altering men's and women's clothes. There was no evidence of the amount of loss of earnings or the cost of treatment or hospitalization, but the court pointed out that damages in those respects may have been substantial.

On the basis of Hanson, taking into account the respective ages of the injured parties, the seriousness and, in some essential respects, the similarity of the injuries, but recognizing the more extensive nature and effect of the injuries in the instant case; taking into account that instant plaintiff's hospital and medical expense was $1,300 and his extra business expense attributable to the accident was $2,500, and that plain-

tiff in Hanson made no proof of any similar monetary losses, but recognizing that plaintiff in Hanson *may have* sustained a substantial loss due to impairment of earning capacity and that any such conclusion as to instant plaintiff would be conjectural, we are of the view that we should not hold the present judgment excessive.

The judgment is affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.