Leo J. ZIPP, Plaintiff-Respondent,

v.

GASEN'S DRUG STORES, INC., Defendant-Appellant.

No. 54318.

Supreme Court of Missouri, Division No. 1.

Jan. 12, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Feb. 9, 1970.

Thurman, Nixon, Smith & Howald, Robert Lee Smith, Hillsboro, for plaintiff-respondent.

Gerald D. Morris, St. Louis, for appellant.

WELBORN, Commissioner.

Appeal by defendant-appellant Gasen's Drug Stores, Inc., from judgment on jury verdict in favor of plaintiff-respondent Leo J. Zipp for $42,800 for personal injuries.

This action arose out of injuries sustained by Zipp while he and others were attempting to move a safe into the Gasen Drug Store at Festus, Missouri, on the afternoon of March 30, 1965. Zipp was a truck driver employed by C. E. S. Truck Lines. He drove the C. E. S. truck in which the crated safe had been loaded from the terminal to the Gasen store. The safe was removed from the truck by an automobile company wrecker and placed on the north edge of the sidewalk in front of the store.

The safe was made of metal. It was 26 inches square and 63 inches high. It weighed 2,970 pounds. The upper portion of the safe had 4½″ walls. It was heavier than the lower part, which had 3½″ walls.

Although Gasen, in answer to plaintiff's request for admissions, categorically denied that its employees were to assist or did assist in any manner in moving the safe into the store, the evidence at the trial showed clearly that Gasen's employees were to assist in getting the safe into the store and no point is made here that the Gasen employee, Henry Rabus, whom plaintiff charged with the specific act of negligence causing his injury was not, at that time, acting within the scope of his employment by Gasen.

According to Zipp, he and another C. E. S. employee, Rudy Whitner, assisted by Gasen's employees, uncrated the safe and attempted to move it inside the store by rolling it on three iron pipes. However, when they reached the door, they found that the bottom of the crate, which had been left under the safe, was too wide to go through the doorway. The safe was rolled back some six to eight feet to the edge of the sidewalk.

Whitner then went to the C. E. S. terminal and got a hydraulic jack or dolly. This device was basically two metal arms, each seven inches wide and several feet in length, mounted on rollers. The outer edges of the arms were twenty-six inches apart, exactly the width of the safe. A hydraulic device would raise the arms from their lowest level of approximately three inches above the floor or ground on which the rollers rested to a height of about six inches. The hydraulic device at the rear of the dolly was operated by a handle which also served as a steering device.

Using a crowbar, the safe was raised and blocks placed under it and the bottom of the crate removed. Then the dolly was run under the safe and the weight of the safe was transferred from the blocks to the dolly arms. The outside edges of the safe were parallel with the edges of the dolly arms. However, the portion of the safe at the

front end of the dolly extended somewhat over the end of the dolly arms so that the safe could be placed against the wall when it got to its location inside the store.

The men tried to shake the safe to be sure that it was securely on the dolly. Satisfied that it was, they began pushing the dolly and its load across the sidewalk to the door. Whitner was at the handle or northern end of the dolly, farthest from the store. Rabus was on the northeast corner of the safe, pushing it, with his right hand at the north side of the safe and his shoulder against the east side. Zipp was on the southeast corner, walking backward with his hand on the safe "to steady it."

When they got the safe about 1½ feet from the door, Zipp, looking over his shoulder, saw that two girls wanted to come out the door. He told his coworkers "either hold it or wait a minute or something to that effect." The movement of the dolly and its load stopped.

Then, according to Zipp:

"Well, then, I still had my hand on the safe, see, I had glanced back to see if it was clear that we could come on through. While I was looking back the one girl did come out through there and the other one was out of my line of vision and I don't know whether she went through at that time or not. I felt the safe move and I glanced up and Mr. Rabus had his hand and shoulder up leaning into the safe and that's when it fell, the safe.

\* \* \* \* \* \*

"\* \* \* [W]hen I looked back I felt the safe move, I felt the safe move and that is when I glanced back to see what was going on and that's when I seen Mr. Rabus with his right hand—I could see all of the left part of his body, with his shoulder hidden behind this safe. He had his arm up here and his other hand here (indicating) and when I looked up he had this foot up to the safe and his body was in a leaning position towards the safe."

Zipp testified that the east side of the safe, on which Rabus was pushing came forward in a short turn, rotating clockwise.

When the safe fell, it struck Zipp's left arm and caught the arm between the safe and the door jamb which was in the center of the two-door store entrance. The nature and extent of injury will be discussed in connection with appellant's claim that the verdict is excessive.

In view of the points raised on this appeal, we need not detail defendant's evidence, which, in effect, was that Rabus was not helping to move the safe when it fell. According to Rabus, Whitner and Zipp were trying to get the safe on the dolly and the safe fell toward the door while Zipp was squatting alongside the safe, adjusting the blocks under it. Just as two girls got through the door, it started to fall. Zipp tried to grab the safe, but it continued to fall and caught his arm between the safe and the door jamb.

Lorna Carter, one of the two girls who came out the door just before the safe fell, was called as a witness by the defendant. She related that she had seen the safe moved to the door on the dolly and that Zipp was backing up to the door as the safe was moved toward the door.

■ Plaintiff's cause of action was submitted on the theory that Rabus "pushed the safe without warning with sufficient force" to cause it to fall. Appellant contends that there was no evidence upon which such a charge of negligence might be based because there was no evidence that Rabus knew or in the exercise of ordinary care should have known that the safe would fall if pushed in the manner described by plaintiff.

Appellant's argument on this score is premised on the testimony of Zipp that, after the safe was squarely on the dolly, he, Whitner and Rabus all tried to "wiggle" the safe around and found it "safe and solid." Appellant also points to Zipp's

testimony that the safe did not shake or wobble as it was moved toward the door and prior to the time that Zipp called for a halt. According to appellant, Zipp's own testimony showed that he was unaware of any danger of the safe's falling as it was moved and Rabus is chargeable with no superior knowledge of any possible danger.

There is no doubt, as appellant argues, that knowledge of the danger to another that an act involves is basic to liability for negligence. "A man cannot be held responsible on the theory of negligence for an injury from an act or omission on his part unless it appears that he had knowledge or reasonably was chargeable with knowledge that the act or omission involved danger to another." 38 Am.Jur., Negligence, § 23, p. 665. The cases of Kettler v. Hampton, Mo.Sup., 365 S.W.2d 518, 522 [3]; Taylor v. Dale-Freeman Corporation, Mo.Sup., 389 S.W.2d 57, 60 [1–3]; and Komeshak v. Missouri Petroleum Products Co., Mo.App., 314 S.W.2d 263, 270 [5], cited by appellant, all involved application of this unquestionable proposition. However, appellant candidly acknowledges that its cited cases did not present the facts here involved. The problem is whether, on the facts of this particular case, there was evidence from which the jury might have found the essential element of Rabus's knowledge of the consequences of his acts, charged as negligence.

In considering this question, the evidence must be viewed in the light most favorable to the plaintiff, who is entitled to the benefit of all favorable inferences which might properly be drawn by the jury from such evidence. Kettler v. Hampton, Mo. Sup., 365 S.W.2d 518, 521 [1]. Viewing the evidence in such light, we must determine whether the jury could properly have found "knowledge, actual or constructive, on the part of the defendant that there is some probability of injury sufficiently serious that the ordinary person would take precautions to avoid it. Zuber v. Clarkson Construction Co., 363 Mo. 352, 251 S.W.2d 52, loc. cit. 55, and cases there

cited. This does not require a balancing of 'probabilities.'" Price v. Seidler, Mo. Sup., 408 S.W.2d 815, 822 [12, 13].

A view of the evidence favorable to plaintiff would support the finding that the top-heavy safe with a metal bottom had been placed on the metal arms of the dolly; that, although the sides of the safe were square with the sides of the dolly arm, the rear of the safe overhung the front end of the dolly arms. Rabus was aware that the safe was top-heavy. Although the safe could not be "shaken" as it rested on the dolly, the moving of the safe on the dolly required the assistance of Zipp to "steady" the safe as it moved. He did so by proceeding ahead of the safe, thereby applying a force to counter the force applied by Rabus with his arm and shoulder to the corner of the safe opposite Zipp. While the dolly was moving, the movement of the dolly coupled with the "steadying" effort of Zipp countered the force applied by Rabus and the safe moved without incident across the sidewalk. The jury could have found that Rabus knew or should have known that the forward movement of the dolly and the steadying efforts of Zipp were significant in maintaining the balance of the safe against the force which he was applying. Rabus could have known that Whitner, pushing on the handle of the dolly, was applying no force against the safe itself. Rabus could also have realized that Zipp, proceeding backward toward the door, was applying a steadying force to the safe. Rabus was supplying the pushing force against the safe itself. When the movement stopped, Rabus should have realized that his resumption of force against the safe without the movement of the dolly and without the countervailing force of Zipp's effort might cause the safe to move on the dolly, as it did, and fall in the direction of the force which he applied and toward Zipp.

Appellant argues that Zipp's testimony that he was "steadying" the safe cannot be the basis of an inference that he was exerting a counter force to that exerted by

Rabus. However, when Zipp's testimony is considered in the light of his further testimony as to his position with respect to the moving safe, and the fact that he was walking backward, we feel that the inference that he was countering the force applied by Rabus is warranted.

We may observe that appellant's basic position appears, in effect, to be that the accident did not and could not have occurred in the manner that Zipp testified. This was a question of fact, resolved by the jury. The jury quite obviously disbelieved Rabus's testimony that he wasn't even near the safe when it fell. The testimony of one of the girls leaving the store, called as a witness by defendant, contradicted Rabus's testimony as to how the accident occurred. No proof of the impossibility of the occurrence, based either on principles of physics or common human experience, has been advanced. Rabus did testify that when, in a demonstrative effort, he tried to move the safe situated on a dolly such as that here involved, he was unable to do so. However, the jury could reject that testimony which could, in no event, be the basis for a conclusion that Rabus was under no obligation too warn Zipp because of the improbability that one man could move the safe.

In our opinion, the evidence, viewed most favorably in the light of plaintiff's contention, did make an issue for the jury on the issue of Rabus's negligence. The court properly left the issue to the jury.

 Appellant contends that plaintiff's verdict-directing instruction was erroneous because it submitted to the jury a different theory of the occurrence than that shown by plaintiff's evidence and because it submitted a theory not supported by the evidence.

Plaintiff's verdict-directing instruction read as follows:

"Your verdict must be for plaintiff if you believe:

"First, defendant's employee Rabus was assisting plaintiff in moving the safe and when he did so was acting within the scope and course of his employment by defendant Gasen's Drug Store, Inc., and

"Second, in doing so said employee pushed the safe without warning with sufficient force so that as a direct result thereof it was caused to fall, and

"Third, said employee was thereby negligent, and

"Fourth, as a direct result of such negligence the plaintiff sustained damage."

Appellant contends that this instruction ignored plaintiff's testimony that the safe was pushed with sufficient force to cause it to move forward and clockwise on the dolly, some six to eight inches, before it started to tip. Appellant argues that, under plaintiff's instruction, the jury might have found for plaintiff even if they did not find that the safe fell as plaintiff testified it did. Appellant argues that the jury might have believed that the safe was ready to tip over at the slightest touch from Rabus's side and that Rabus supplied such force by merely touching the safe, perhaps to rest his hands.

Apparently, appellant would have had plaintiff submit that Rabus pushed the safe with sufficient force to cause it to move six to eight inches forward and clockwise and then fall on plaintiff.

 In our opinion, this was an evidentiary, not an ultimate, fact. The clear purpose of the new method of instructing juries, adopted by Supreme Court Rules 70.01 and 70.02, V.A.M.R., effective January 1, 1965, was to submit ultimate issues, not evidentiary details. This is an instruction not found in M.A.I. Plaintiff, in drafting the instruction, was subject to the requirement that the instruction submit only the ultimate factual issues, be within the general scope of the pleadings, not assume issuable facts, and be understandable by a reasonably intelligent jury. Price v. Seidler, Mo.Sup., 408 S.W.2d 815, 823–824 [15], [16–18].

The ultimate issue in this case was whether the safe fell when Rabus pushed it, without warning to Zipp. Zipp did not, as appellant states, testify explicity that Rabus "pushed" the safe. He did state that, when he looked back as the safe started to move, "Rabus had his hand and shoulder up *leaning into the safe* * * *." The possibility that the safe fell from a mere touch of Rabus was nowhere suggested. The testimony that the safe could not be shaken before the movement started would dispel such an idea. The entire theory of plaintiff's case was that Rabus pushed with force. Zipp never did describe the exact degree of force, but the fact that Rabus was "leaning into the safe" would infer the use of force other than a mere touching.

The issue before the jury was whether or not Rabus did apply force and cause the safe to fall or whether, as he testified, he was several feet away and did not even touch the safe. Plaintiff's instruction adequately presented the ultimate factual issue and was not required to submit the evidentiary matters suggested by appellant. The argument that the instruction submitted a theory not pleaded is on the same basis as the argument that the instruction submitted a theory not supported by the evidence. The argument is without merit.

Appellant contends that the verdict-directing instruction was erroneous because there was no evidence to support the required finding of Rabus's negligence. This is based, essentially, upon the argument that there was no evidence upon which a finding of negligence might be based. We have determined that contention adversely to appellant in deciding that there was a submissible case of negligence of Rabus.

█ Appellant's next assignment of error is based on the court's giving plaintiff's Instruction Number Three, defining "ordinary care" under M.A.I. 11.05. There is no doubt that, since plaintiff's verdict-directing instruction spoke in terms of negligence, M.A.I. 11.02, subd. I should have been given. Epps v. Ragsdale, Mo.App.,

429 S.W.2d 798, 801 [6, 7]. Respondent points out that the objection was raised neither at trial under Civil Rule 79.01, V.A. M.R., nor in appellant's motion for new trial as required by Civil Rule 79.03, V.A. M.R. Such omission would preclude consideration of the objection raised for the first time on this appeal (McConnell v. Pic-Walsh Freight Company, Mo.Sup., 432 S.W. 2d 292, 301 [17]), unless, as appellant requests, the question is to be considered under the plain error rule. Civil Rule 79.-04, V.A.M.R.

We do not consider that the error in this case produced a "manifest injustice or miscarriage of justice" within the meaning of Rule 79.04. Counsel for both parties, in argument to the jury, related Rabus's duty to the standard of ordinary care. The jury was told by plaintiff's counsel: "Negligence is said to be the failure to use ordinary care." While such a statement would not ordinarily supply a defect in an instruction, the statement is not lacking in significance in considering whether there was an injustice or miscarriage of justice because of the failure of the instruction to bridge the gap between negligence and ordinary care. Defense counsel argued: "How would he [Rabus] know that the twenty-nine hundred seventy pound safe was going to move? How would you know that would move? Did he do anything out of the ordinary? Did he exercise ordinary care?"

█ In our opinion the issue was presented to the jury adequately and there is no occasion for application of the plain error rule. Application of the plain error rule is necessarily on a case-to-case basis. We find no support for its application here in the cases cited by appellant. Coursey v. Hawthorne, Mo.App., 389 S.W.2d 847, and Highfill v. Brown, Mo.Sup., 320 S.W.2d 493, involved application of the plain error rule in favor of a party who had not raised a point of error when the case was reversed for error properly raised by another party. Fields v. Kansas City, Mo.Sup., 383 S.W.2d 543, involved consideration of a damage instruction in a case where there had been

an obvious error in the reference to the instruction number in a motion for new trial. Helfrick v. Taylor, Mo.Sup., 440 S. W.2d 940, 945 [5], while referring to the use of M.A.I. 11.02 defining negligence as mandatory in a negligence case, did not involve the plain error rule.

Appellant assigns as error the court's refusal to permit the jury to view the actual safe involved, sitting on the dolly. The dolly used had been obtained by subpoena to C.E.S. Truck Lines. The safe, sitting on the dolly, had been transported by truck to a parking lot about a half block from the courthouse at which the trial was held. An insurance investigator, testifying on behalf of defendant, testified that he had obtained the dolly and had supervised the placing of the safe on the dolly. The safe had been placed squarely on the front of the dolly, with the edge of the safe at the front some one and one-half inches over the end of the dolly arms. The witness testified that he pushed at the safe in this position, as did three men in the truck crew, but the safe did not move, and that none of them could push it over.

Appellant's counsel then requested the court to permit the jury to go to the parking lot to view the safe sitting on the dolly. The request was refused. There had been prior discussion of the request, during which the court had noted that several photographs of the dolly had been introduced into evidence. The defendant introduced four photographs of the dolly. Plaintiff introduced a large color photograph of the dolly, as well as a photograph of the safe, apparently as it stood inside the store.

 Appellant contends that the trial court abused its discretion in refusing to permit the jury to view the actual objects, contending that such a view would have been instructive and helpful to the jury and that the court erred in refusing the request. In the only case cited by appellant in support of this proposition, Hampton v. Rautenstrauch, Mo.Sup., 338 S.W.2d 105, the court did consider the help which the exhibition

of objects involved, there a neck and a back brace and a traction device, might afford the jury. However, the trial court had admitted the articles in that case. The assistance which the actual objects afforded was considered in determining whether the admission of the exhibits was an abuse of the trial court's discretion. However, it does not follow that a showing that a view by a jury of the actual objects would be helpful necessarily demonstrates an abuse of discretion when the trial court refuses to permit such a view. Of course, if a view would not be of assistance to the jury, there could be no abuse of discretion. However, helpfulness itself does not deprive the trial court of its right to consider other circumstances in determining whether a request to permit the jury to leave the courtroom and view an object should be granted. In this case, the photographic evidence clearly portrayed the objects involved. The witnesses had no difficulty in oral testimony in describing them. The trial court did not abuse its discretion in refusing the requested view. "A view is not a matter of right but rests in the sound discretion of the trial judge as to whether it is proper or necessary to enable the jury to obtain a clearer understanding of the issues involved or to make a proper application of the evidence. 'It is only when there has been a flagrant abuse of this discretionary power that this court will interfere.' Young v. Pa. Fire Ins. Co., 269 Mo. 1, 20, 187 S.W. 856, 861; Very v. Willi (Mo.App.) 293 S.W. 500; Coyne v. Golland (Mo.App.) 243 S.W. 376; Gunn v. Hemphill Lbr. Co. (Mo.App.) 218 S.W. 978; Ellis v. St. Louis I. M. & S. R. Co., 131 Mo.App. 395, 111 S.W. 839." City of St. Louis v. Worthington, 331 Mo. 182, 52 S.W.2d 1003, 1010.

The doctrine of "curative admissibility," invoked by appellant, citing Alvey v. Sears, Roebuck & Co., Mo.Sup., 360 S.W.2d 231, 234, and State ex rel. State Hwy. Comm. v. Schutte Investment Company, Mo.Sup., 334 S.W.2d 241, 247, has no application here. Testimony and photographic evidence offered by plaintiff in his case did not permit

defendant, as a matter of right, to have the jury view the actual objects. That remained a matter for the trial court's exercise of its discretion.

◼ Appellant complains of the trial court's refusal to permit his attorney, on final argument, to comment on the absence of Mr. Rudy Whitner, the fellow employee of plaintiff who was present at the time of the occurrence in question. The trial court ruled that Whitner was equally available to either party and refused to permit the comment. Appellant would extend to this case the rule, frequently applied in Missouri, that the employee of a party to litigation is under the control of that party and therefore not equally available as a witness to the opposing party to the litigation. Therefore, such opposing party may argue to the jury that the inference is that the employee who did not testify would have testified adversely to his employer. See Hancock v. Union Pac. R. Co., Mo.App., 231 S.W.2d 225, 228–229 [6], [7]; Duboise v. Railway Express Agency, Inc., Mo.Sup., 409 S.W.2d 108, 113–114 [1, 2], [3]; Wehrkamp v. Watkins Motor Lines, Inc., Mo. Sup., 436 S.W.2d 698, 714–716.

Appellant would apply the rule as to failure of plaintiff to call Whitner, although the employer, C.E.S. Truck Lines, was not a party to the litigation. The argument is that C.E.S. workmen's compensation insurance had paid some $4,100 in temporary disability and medical payments for Zipp's injury; that the insurer was interested in the outcome of the litigation to the extent of such payments and also possible additional payments and that C.E.S. was interested to the extent that the loss to its insurer might adversely affect its workmen's compensation insurance premiums. Appellant cites no cases in which application of the rule here in question has been so extended. Appellant would extend the rule to say, in effect, that an employee of a nonparty who has a remote interest in litigation thereby becomes subject to the control of the actual party litigant through whom such interest is derived so as to make such employee more available to such party litigant. The reason for the existing rule has no application in such a situation. See Cooper v. Metropolitan Life Ins. Co., Mo.App., 94 S.W.2d 1070, 1073 [4]. We will not extend the rule to cover such a situation.

Appellant also argues that Whitner, as a fellow employee of Zipp, was more available, by reason of such relationship to Zipp, within the rule permitting an adverse inference to be drawn for failure to produce Whitner as a witness.

"Both ties of interest and affection have been held to justify the inference. The family relationships seem to offer obvious instances where a witness might be supposed to be more favorably disposed to one than the other of the parties, and the courts have raised the inference in such cases, rarely, however, extending the presumption past the immediate family. The economic interests of an employee have been held to make him peculiarly available to his employer, the courts splitting, however, on their conclusions as to whether this special availability continues after the relationship has been severed. The professional relationship of physician and patient or attorney and client have also been held to indicate special control so as to justify the inference; however, the cases indicate considerably more reluctance on the part of the courts in permitting the inference from such a relationship, perhaps from a consideration that such witnesses are less likely to be swayed by interest, and, in the case of the attorney, from the ethical considerations involved." Annotation, Relationship between party and witness as giving rise to or affecting presumption or inference from failure to produce or examine witness, 5 A.L.R.2d 893, 896.

Appellant has cited no cases holding that a fellow employee of a party is such a relationship as gives rise to an inference from the party's failure to call his fellow employee. Narens v. St. Louis Public Service Co., Mo.App., 238 S.W.2d 37, the

only case cited by appellant on this point, did not involve such a situation.

The situation was presented in Holtz v. Daniel Hamm Drayage Co., 357 Mo. 538, 209 S.W.2d 883, 887 [6], the court concluding in that case that "the plaintiff's fellow employees and employers were equally available to both parties." The trial court's ruling in this case, in accord with such holding, was not erroneous.

■ Appellant contends that the trial court erred in refusing its tendered instruction on contributory negligence. The instruction would have submitted two grounds of contributory negligence: "[P]laintiff either failed to remove his hand and arm from between the safe and building when the safe started to move, or failed to warn Henry Rabus that his (plaintiff's) arm was in a dangerous position."

Defendant's answer, in setting up its plea of plaintiff's contributory negligence, made no reference to plaintiff's failure to warn Rabus that plaintiff's arm was in a dangerous position. Therefore, it was not error for the trial court to refuse the instruction submitting grounds not pleaded. Litt v. Allen, Mo.App., 313 S.W.2d 183, 187 [6, 7]; Cochran v. Jefferson County Lumber Co., Mo.App., 132 S.W.2d 32, 38 [10, 11].

■ Appellant's final contention is that the verdict for $42,800 in favor of plaintiff was so grossly excessive as to show that it was the result of passion and prejudice on the part of the jury and, alternatively, that the verdict is excessive and should be reduced by remittitur. We consider the latter contention first. It is the contention primarily advanced in appellant's argument, and, if without merit, the contention that the size of the verdict is "conclusive proof" of misconduct will require no consideration. Pyles v. St. Louis Public Service Co., 372 S.W.2d 114, 119 [8, 9].

Zipp is a truck driver, 46 years old at the time of trial in September, 1968. He is right-handed and had no physical disability prior to the accident. His injury was confined to his left forearm. He received an open comminuted fracture of the radius and ulna of the left forearm. He was taken to Barnes Hospital in St. Louis on March 30, 1965, the day of the injury. An operation was promptly performed under general anesthetic. A considerable area of necrotic muscle tissue was removed. Incisions were made over the lower end of the radius and ulna, the ends of the bones exposed, and drill holes made in the ends of the bones and a rush rod inserted. The fracture of each bone was reduced and the rush rod passed across the fracture into the bone above the fracture on each bone. Swelling prevented the wound being brought together and the wound was left open.

On April 5, Zipp was returned to surgery and a delayed primary closing of the wound was done under general anesthetic. Wounds that could be closed were sutured. Tissue damage in the area where the radius had come out was so great that the wound could not be sutured and a graft of skin taken from the thigh was made in that area in order to fully cover the area with skin. The arm was then placed in a plaster cast. On April 13, Zipp was released from the hospital.

Zipp saw his treating physician once in May and once in June. X-rays taken in July, 1965 showed that the broken bones were not going to unite and Zipp was readmitted to Barnes Hospital on July 27 for bone graft. On July 28, an operation was performed, under general anesthetic, and bone from the iliac crest was packed around the fracture sites. He was discharged from the hospital August 5. He saw the doctor in his office on September 9 and again on November 12, when the cast was finally removed from the arm.

According to Zipp's physician, Zipp's condition at trial, except for removal of the rush rods, was approximately the same as the physician observed upon examination

on March 19, 1966. At that time the left forearm was found one inch in diameter smaller than the right, reflecting muscle loss in the left forearm, some atrophy and fibrosity of the remaining muscle. There were injury and surgical scars on the left forearm. Motion in the left elbow was restricted by about five degrees at flexion and fifteen degrees at extension. Supination of the left hand was limited by one half and pronation to one sixth of normal flexion and extension of the left wrist was a little over half of normal. The index, middle and ring fingers of the left hand would not touch the palm in making a fist because of swelling and residual stiffness in the joint and loss of muscle power. On July 8, 1968, plaintiff was admitted to Barnes Hospital for three days. During that stay the rush rods were removed under general anesthetic.

Zipp testified that he experiences pain in his arm all the time, "like a steady bruise." He gets by all right driving a truck but he can't get a good tight grip on the steering wheel with his left hand. Before the accident, he hunted and fished "almost all" of his spare time. Since the accident, he found that the jar of a gun shot hurts his arm and he no longer hunts. He still fishes, but has difficulty in casting and in handling a boat alone.

Zipp lost earnings of around $6,000 from being off work for eight months. His medical expense totalled $2,514.63. Since he returned to work in November, 1965, he has worked regularly as a truck driver, receiving the union scale of wages. His earnings for 1966 were $8,881.45.

The principles governing our consideration of the question here raised have been often stated. For example, in Goodman v. Missouri Pacific R. Co., Mo.Sup., 312 S.W. 2d 42, 49 [8, 9], the court stated:

"There is no precise formula for gauging whether a verdict is excessive. Each case depends upon its own peculiar facts. Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and his diminished earning capacity, if any, the changing economic factors and the amount of compensation awarded and approved in cases similar or of fairly comparable injuries. The ultimate test of excessiveness or of inadequacy of an award is what will fairly and reasonably compensate for the injuries sustained."

See Turner v. Yellow Cab Co. of Springfield, Mo.App., 361 S.W.2d 149, 157–158.

Appellant cites three cases which it states show what has been considered a fair measure of damage for an injury such as plaintiff sustained, although appellant admits that none of its cases involved solely the type of injury here suffered.

Caraway v. A. T. & S. F. Ry. Co., Mo. Sup., 318 S.W.2d 331, involved a $60,000 verdict, reduced on appeal to $45,000, to a 19-year-old boy who sustained a fracture of the left ulna along with numerous other fractures and injuries which left him about 50% permanently partially disabled. He was hospitalized for 26 days, with medical expenses of $2,172.62. No loss of wages was shown. Appellant argues that, if the injuries sustained by plaintiff in that case warranted a recovery of only $45,000, the injury involving the left arm alone must have justified only a portion of the recovery finally allowed and an award of $42,800 for such an injury in this case is obviously excessive.

In Flournoy v. Kuhn, Mo.App., 378 S.W. 2d 264, the court ordered a new trial and also held that the new trial should include the issue of damages because a $15,000 verdict in favor of a high school student who had sustained a fracture of both her left and right radii, with the left healing without further trouble and the right with a limitation on flexion at the elbow and a limitation of motion at the wrist was excessive. The girl was not hospitalized, lost no time from school and had no special damages.

Appellant also cites Nussbaum v. Kansas City Stock Yards Co. of Maine, Mo. Sup., 359 S.W.2d 335, in which an $82,106.20 verdict was held not excessive. Plaintiff in that case, a 47-year-old man, suffered a fracture of the left radius and ulna, with resulting disability to the shoulder. Plaintiff also sustained severe head injuries, lung injuries, pelvic fracture, sacral and lumbar vertebral fractures, fracture of the left tibia and fibula, all of which combined to leave plaintiff 75% permanently disabled and industrially unemployable. Appellant argues, again, that since the arm injury constituted only a minor portion of plaintiff's injuries, the amount for such injury must have been only a relatively small portion of the total award.

We find none of these cases particularly helpful. Cases involving a combination of injuries which included injury to an arm are of little assistance. Although the major injury was to the same limb in Flournoy, the absence of hospitalization in that case demonstrates a considerable difference in the severity of the injuries there and here involved.

Respondent points to the 1957 decision in Hamilton v. Ross, Mo.Sup., 304 S.W.2d 812, which sustained a $20,000 verdict in favor of a 70-year-old man who sustained a "Colles fracture" of his right wrist and comminuted fractures of the left elbow, who was hospitalized twice for a total of 13 days, with special damages of $3,800 and a 60% limitation of motion of the left arm, and who showed no impairment of earning capacity or loss of earnings. Respondent argues that the $20,000 verdict in that case would require today $27,200 to equal it in purchasing power terms and that an additional $10,900 to Zipp was justified by the difference in ages between Zipp and Hamilton and the more serious medical procedures required by Zipp.

The most recent case which we find and in which the question of excessive damages was considered in connection with an injury somewhat comparable to that here in Hart v. City of Butler, Mo.Sup., 393 S.W. 2d 568, decided in 1965. There a $25,000 verdict was reduced to $20,000. Plaintiff was a 68-year-old piano teacher who sustained fractures of the left humerus leaving a functional disability of the left shoulder of 50%. She was hospitalized 28 days and had special damages of $900, but suffered no loss of earnings or impairment of earning capacity, although she encountered some difficulty in her piano teaching.

The verdict in this case is considerably larger than the amount finally approved in Hart. However, we do not feel that approval of the verdict in this case would do violence to our rule of uniformity. Of significance is the difference between the age of Miss Hart and of plaintiff here, the more serious original injuries sustained by Zipp, the more costly and more serious repeated surgical procedures required by Zipp, his loss of earnings, the interference with his former recreational activities and, finally, the constantly eroding purchasing power of the dollar, amounting to some 20% from the time of the Hart decision to the present.

Considering all of these factors and viewing, as we must, the evidence most favorable to the verdict, we conclude that the verdict is not excessive, and, necessarily, therefore, that the verdict is not so grossly excessive as to be conclusive evidence of passion and prejudice against defendant.

Judgment affirmed.

HOUSER, C., would affirm only on condition of remittitur.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

SEILER, P. J., and HOLMAN, J., concur.

CARVER, Special Judge, concurs in the opinion except he would require a remittitur as stated in memorandum of HOUSER, C., which he adopts.

STORCKMAN, J., not sitting.

HOUSER, Commissioner (dissenting).

I dissent only on the question of the amount of damages, being of the opinion that a remittitur in the order of $12,000 to $15,000 is required under the rule of uniformity of verdicts. Ciardullo v. Terminal Railroad Association of St. Louis, Mo.Sup., 289 S.W.2d 96, 61 A.L.R.2d 516; Hart v. Butler, Mo.Sup., 393 S.W.2d 568; Boehm v. St. Louis Public Service Co., Mo.Sup., 368 S.W.2d 361.